IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | 12-cr-0421-1 |
| ODELL GIVENS et al., ) | Judge John Z. Lee |
| Defendants. ) | |

## **MEMORANDUM OPINON AND ORDER**

Defendant Odell Givens has filed a *pro se* motion to withdraw his guilty plea [315]. In support of his motion, Givens argues that his lawyers should have moved to suppress the government's evidence against him, which he says was collected in violation of the Fourth Amendment and 18 U.S.C. § 2518, the statute that sets out the procedures for obtaining permission to intercept electronic communications. He explains that he learned of these purported violations only after pleading guilty. For the reasons given below, the Court denies Givens's motion.

## **I. Background**

Following an investigation that gathered evidence through wiretaps, Givens and eighteen codefendants were charged with multiple drug crimes, including conspiracy. Without the benefit of a plea agreement, Givens pleaded guilty on February 14, 2014, to three counts of possessing cocaine with the intent to distribute, and one count of conspiring to do the same, *see* 21 U.S.C. §§ 841(a)(1), 846. Because of the drug quantities involved and Givens's criminal history, he faces

a statutory minimum sentence of 20 years of imprisonment. *See id.* § 841(b)(1)(A)(ii).

The investigation of Givens's drug activities grew out of the investigation of two related street gangs, the Imperial Insane Vice Lords and the Traveling Vice Lords. The original target of that investigation was a man name Nathaniel Hoskins,[1] who was allegedly a leader of the Imperial Insane Vice Lords. Information learned through a wiretap of Hoskins's phone led law enforcement to seek permission to tap additional phones, including the phone of Jettie Williams,[2] an alleged member of the Traveling Vice Lords, who had been in contact with Hoskins. While monitoring Williams's phone, federal investigators intercepted conversations between Williams and Givens in which the two men discussed meeting so that Givens could sell drugs to Williams. At least that is the government's interpretation of the men's conversations, in which they do not explicitly refer to drugs but do conspicuously avoid naming the reason for their impending meeting. Givens has offered no alternative innocent interpretation of the phone calls.

Based on those conversations, an Assistant United State Attorney submitted a wiretap application in September 2011 for Givens' cellular phone. *See* Gov. Ex. A, Sept. 2011 Application. The application and supporting affidavit laid out the circumstances of the ongoing investigation into the Vice Lords factions and stated that the proposed interception of Givens's phone would likely produce evidence of

---

[1] Hoskins was recently sentenced to life in prison for ordering a murder. *See United States v. Hoskins*, 13-CR-0772 (N.D. Ill. May 12, 2016).

[2] Williams died without being prosecuted.

gang activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) as well as evidence of a drug-distribution conspiracy. The affidavit, which was executed by an officer of the Chicago Police Department who had been deputized as a Task Force Officer for the Drug Enforcement Administration, described Jettie Williams as a leader of the Traveling Vice Lords who had been in contact with members of the Imperial Insane Vice Lords, and it included transcribed excerpts from the conversations between Williams and Givens about meeting for a drug sale. The affidavit explained that, "[t]hrough wire interceptions over Target Phone 6 [Williams's phone], in conjunction with surveillance, agents have identified GIVENS as a source of supply for WILLIAMS's drug spot." Gov. Ex. A, Sept. 2011 Wiretap Application, Aff. ¶ 12. Based on that application, Judge Holderman issued an order authorizing the interception Givens's calls.

The wiretap of Givens's cell phone allowed law enforcement to intercept additional conversations in which Givens made arrangements to sell drugs. The investigation also was expanded to look into associates of Givens who were suspected of being part of his drug-distribution ring, and other wiretap applications were submitted and approved. *See* Gov. Exs. B–F, Wiretap Applications. Givens eventually changed phone numbers, but an application to intercept calls on the new phone was submitted in July 2012 and approved. *See* Gov. Ex. G, June 2012 Application.

Although Givens apparently was not a gang member, had no direct connection to the Imperial Insane Vice Lords, and did not know Hoskins, the

wiretap applications targeting him listed Hoskins and many others who lacked a direct connection to Givens as targets of the same investigation. But the applications do not claim that Givens was in contact with Hoskins or was supplying drugs to the Imperial Insane Vice Lords. To the contrary, the affidavit supporting the September 2011 application acknowledges that Givens had "not been intercepted on either of HOSKINS's phones" and that Hoskins had "no known involvement" with the drug sales of the Traveling Vice Lords, which was the group, purportedly led by Williams, that Givens was allegedly supplying. Gov. Ex. A, Sept. 2011 Wiretap Application, Aff. ¶ 38. The affidavit also states explicitly that the certain cooperating witnesses with ties to the Imperial Insane Vice Lords had no "ability to provide information or access to the TVL faction of the Vice Lords, which is where the investigation indicates GIVENS supplies his narcotics." *Id.* ¶ 54.

Givens retained two lawyers following his arrest. These lawyers did not seek to suppress the wiretap evidence but, according to Givens, instead encouraged him to cooperate, in part by testifying before a grand jury. Givens gave grand jury testimony incriminating himself and others, but later, for reasons unexplained, he rejected a cooperation agreement from the government.

Subsequently, Givens's lawyers encouraged him to plead guilty. During the plea colloquy, he clearly acknowledged his awareness of the trial rights he was giving up by pleading guilty. Trans. of Change of Plea Hearing at 10–12 [289]. When asked whether he was satisfied with the representation his attorneys had provided, he replied that they had done "the best they could." *Id.* at 7. And when

asked whether he had had sufficient time to discuss the issues in his case with his attorneys, he answered, "Yes." *Id.* at 7–8.

According to Givens, two weeks after pleading guilty, his lawyers finally complied with his request that they forward him the discovery from his case. By examining those documents—which included the Title III wiretap applications that had allowed the government to intercept his phone calls—he became convinced that the applications contained material falsehoods connecting him to the criminal activities of the Imperial Insane Vice Lords and the Traveling Vice Lords. Based on what he learned from the wiretap applications, Givens filed a *pro se* motion to withdraw his guilty plea [315]. He is still represented by counsel—now by a lawyer the Court appointed following Givens's guilty plea and the withdrawal of his prior lawyers—but she declined to file the motion, and the Court gave him permission to file it himself.

## II. Analysis

In his motion and subsequent filings, Givens has painstakingly and thoughtfully laid out the reasons he believes he should be allowed to withdraw his guilty plea. In short, his position is that his lawyers, rather than encouraging him to plead guilty, should have filed a motion to suppress the wiretap evidence against him. This failure to file a suppression motion constitutes ineffective assistance of counsel, he argues. He also argues that his own grand jury testimony and the testimony of other witnesses against him is fruit of the poisonous tree and should be suppressed along with the wiretap evidence.

The Court may grant Givens's motion to withdraw his guilty plea for any "fair and just reason." Fed. R. Civ. P. 11(d)(2)(B). That standard would be satisfied, of course, if his plea "was not entered into knowingly and voluntarily," *United States v. Singleton*, 588 F.3d 497, 500 (7th Cir. 2009), and a "guilty plea entered by a defendant who has received ineffective assistance of counsel is generally deemed to be involuntary," *United States v. Wallace*, 276 F.3d 360, 366 (7th Cir. 2002). But to establish "ineffective assistance in this context, a defendant must show that his lawyer's performance was objectively unreasonable and that, but for counsel's errors, the defendant would not have pled guilty." *United States v. Lundy*, 484 F.3d 480, 484 (7th Cir. 2007). Additionally, when a "claim of ineffective assistance is based on counsel's failure to present a motion to suppress," the defendant must "prove the motion was meritorious." *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005).

Givens contends that a motion to suppress the wiretap evidence would be meritorious because, in his view, the wiretap applications did not comply with the Fourth Amendment or the statutory requirements of 18 U.S.C. § 2518. His objections to the applications all relate to their incorporation of information about the investigation into the Imperial Insane Vice Lords that initially brought him to the government's attention.

At times, Givens seems be making a broad argument that the government simply was not permitted to expand its investigation from the members of the Imperial Insane Vice Lords to Williams, a suspected Traveling Vice Lord, and his

suspected drug supplier, Givens. For example, Givens writes that "the government joined Givens to an unrelated ongoing criminal investigation to obtain evidence not relevant and material to said ongoing criminal investigation." Mot. Withdraw at 18. He also states that "[e]vidence gained on Givens and associates is irrelevant to ongoing criminal investigation into the criminal activities of Hoskins." *Id.* at 23. But Givens offers no authority (and the Court finds none) to support the proposition that the government may not expand an investigation in this way.[3]

Givens also argues that the wiretap applications do not demonstrate probable cause. The Court can focus this inquiry on the September 2011 application because—if Givens' is right that the evidence gained from that application should be suppressed—he is likely right that evidence gained through subsequent applications should be suppressed as well.

The heart of Givens' probable cause argument is that the application implicitly attributes the criminal activities of the Imperial Insane Vice Lords to Williams and, ultimately, to Givens. He points out that, although the government has never accused him of RICO violations, the application names RICO as one of the "Subject Offenses" and asserts that there is probable cause to believe that Hoskins and a long list of others—including Givens—"have committed, are committing, and will continue to commit the Subject Offenses." Gov. Ex. A, September 2011 Application, at 4–5. "A judge," Givens contends, "may mistakenly

---

[3] Although the "minimization" principle prohibits law enforcement from listening to conversations unrelated to the investigation identified in the wiretap investigation, *see* 18 U.S.C. § 2518(5), Williams was being investigated for RICO violations and drug distribution, so the minimization principle would not prohibit law enforcement from listening to his drug-related conversations with Givens.

7

think that all the Violators listed were part of one group involved in similar violations of the law." Mot. Withdraw at 6.

Indeed, the application is not a model of clarity. A casual perusal would lead a reader to believe that all of the targets were engaged in the same criminal enterprise and that each of them was suspected of committing both RICO and drug crimes.

That mistaken impression, however, is swept away by the probable cause section of the affidavit supporting the application. There the affiant states without ambiguity:

> The investigation to date has revealed that ODELL GIVENS is a heroin supplier. Among his customers is JETTIE WILLIAMS, a leader of the Traveling Vice Lords ("TVL"), which is street gang that distributes controlled substances in Chicago, Illinois, the surrounding areas, and elsewhere.

Gov. Ex. A, Sept. 2011 Application, Aff. ¶ 11. The affiant then goes on to support that assertion with the transcripts of calls between Williams and Givens. Nowhere is Givens accused of being a member of either Vice Lords faction.[4] Rather, the application accuses him of being a drug supplier to

---

[4] A later section of the affidavit, in which the affiant explains why traditional investigative techniques are insufficient as required by 18 U.S.C. § 2518(1)(c), includes a statement about the difficulty of catching "higher level gang members[]," including Givens, by surveilling open-air drug markets. Although this statement is technically untrue because Givens was not thought to be a gang member, the purpose of it seems to be to communicate that Givens is at a high level in his own drug-trafficking organization and so unlikely to be selling on the street. In any event, the remark that Givens was a high-level gang member does not appear in the probable cause section of the affidavit. The significance of the statement for "alternative means" section of the affidavit is discussed below.

Williams, who was being investigated for his alleged role in the Traveling Vice Lords.

The Court finds that the wiretap applications, although they superficially may seem to accuse Givens of gang activity, in fact only accuse him of being a drug supplier to a gang. For this reason, the Court finds that the applications would not mislead a judge into a mistaken belief that they were supported by probable cause. Rather, the applications, though flawed, legitimately establish probable cause.

Givens's second challenge to the wiretap evidence is based on 18 U.S.C. § 2518(1)(c), which requires the government to include in Title III applications "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Givens presents a developed objection to two aspects of the "necessity" sections of the applications.

One flaw Givens points to is found in the necessity section of the June 2012 application. The affiant there states that traditional investigative techniques are insufficient in part because certain suspects who had been interviewed were not forthcoming about their criminal activities. *See* Gov. Ex. G, June 2012 Application, Aff. ¶ 141; Mot. Withdraw at 6, Intro. to Def. Ex. 3.2, June 2012 Aff. The problem Givens identifies is that the suspects in question have no connection to him at all.

Givens is correct that the behavior of these suspects, assuming they had no connection to him or even to Williams, could not have any bearing on the challenges presented by investigating Givens. But even though the witnesses' behavior is

irrelevant as regards Givens, the remaining portions of the necessity section of the affidavit are sufficient to meet the requirement of § 2518(1)(c). "The government's burden is not great, and compliance with this requirement is analyzed in a practical and common-sense fashion. The statute does not require the government to show absolute necessity; the point is to ensure that wiretaps are not used routinely as the first step in an investigation." *United States v. Durham*, 766 F.3d 672, 679 (7th Cir. 2014) (internal quotations marks and citation omitted). The affidavit explains at length that simple surveillance of Givens is insufficient to uncover the workings of his drug distribution ring and that other investigative techniques like garbage pulls are impractical given the rural location of Givens's home. *See* Gov. Ex. G, June 2012 Application, Aff. ¶¶ 153–63.

Another statement Givens identifies as problematic is found in the necessity section of the September 2011 affidavit. *See* Mot. Withdraw at 27–28; *see also* footnote 4, *supra*. The affiant there asserted that surveilling known open-air drug markets would be insufficient to investigate Givens because this technique "would not reveal higher level gang members', like GIVENS or ROBERT and JETTIE WILLIAMS's, interest in the drug sales at these locations." Gov. Ex. A, Sept. 2011 Application, Aff. ¶ 81. This statement, Givens correctly points out, misrepresents him to be a gang member. Again, however, the remaining explanation of why electronic surveillance is needed is sufficient to satisfy the government's low burden under § 2518(1)(c). Gov. Ex. A, Sept. 2011 Application, Aff. ¶¶ 45–51.

Givens, the Court concludes, has not shown that a motion to suppress the wiretap evidence would have been meritorious. Because his ineffective assistance of counsel argument is premised solely upon this basis, Givens has not established that his guilty plea was the result of ineffective assistance of counsel, and he has not identified a fair and just reason to permit the withdrawal of his guilty plea. *Lundy*, 484 F.3d at 484; *Cieslowski*, 410 F.3d at 360.

### III. Conclusion

For the reasons set forth above, the Court denies Givens' motion to withdraw his guilty plea. This case will proceed to sentencing.

**SO ORDERED**  ENTER:

7/8/2016

_____
JOHN Z. LEE
United States District Judge